**SAVAGE et al.**

v.

**SCRIPTO–TOKAI CORP.**

**No. 3:00CV1158(JBA).**

United States District Court,
D. Connecticut.

May 30, 2003.

Richard A. Bieder, Gertrude A. Kiaunis, Joshua D. Koskoff & Boeder, P.C., Bridgeport, CT, Rosalind J. Koskoff, Bridgeport, CT, Christopher T. Goulden, Larracuente & Goulden, Bridgeport, CT, Michael A. Stratton, Joel Thomas Faxon, Stratton Faxon, New Haven, CT, for plaintiffs.

James H. Rotondo, Maxwell Branson, Day, Berry & Howard, Hartford, CT, Keith A. Sipprelle, Mark K. Suzumoto, Van Etten Suzumoto & Becket, Santa Monica, CA, for Scripto–Tokai Corp, defendant.

### Ruling on Pending Motion [Doc. # 110]

ARTERTON, District Judge.

In the early morning hours of August 25, 1997, a fire broke out at the Savage home in Bridgeport, Connecticut, killing Marie Savage and injuring Jessica, Mary Ann and Dawn Savage. Plaintiffs claim that the fire was started by Mary Ann (who was then seven years old and is moderately mentally retarded [1]) using an Aim 'n Flame utility lighter sold by the defendant, and assert that the lighter was defective because it lacked a child-resistance feature. Defendant has moved for summary judgment, arguing that plaintiffs cannot prove that Mary Ann used the lighter to start the fire, and that even if they could, the lighter is not defective under Connecticut law. As part of its motion for summary judgment, defendant seeks to preclude the testimony of Bruce Collins, who plaintiffs plan to use as an expert witness on the question of causation. For the reasons set out below, the motion is denied.

I. Background [2]

Sounding much like the game of Clue, plaintiffs' theory of this case is that Mary Ann started the fire, in the living room, with the lighter. Bridgeport Fire Marshal Bruce Collins, who conducted a cause and origin investigation of the fire and concluded that "it is more probable than not that the fire was started in [the living room] sofa area with the grill lighter by Mary Ann," Collins Dep. at 171, is one of plaintiffs' experts. Collins based his conclusion on the lack of any plausible alternative

---

**1.** *See* Report of Neuropsychological Examination of Mary Ann Savage by Timothy Belliveau, Ph.D [Pl.'s Ex. P] at 6.

**2.** Throughout this opinion, the Court presents the facts in the light most favorable to plaintiffs, the non-movants.

cause of the fire and circumstantial evidence: the fire started in the living room sofa, with Mary Ann found nearby either on top of the lighter or within close proximity to it, with burns on the palm of her right hand. As Collins himself acknowledges, he cannot be 100% certain of his conclusion as he has no way of recreating the situation and no competent direct eyewitness evidence; however, he has concluded that plaintiffs' scenario is more likely than not what happened. .

While Mary Ann is claimed to have admitted that she started the fire,[3] there is no admissible non-hearsay testimony to that effect. Mary Ann was deposed almost four years after the fire, but she gave mostly one-word answers, often after prompting by her aunt. While Mary Ann stated that on the morning of the fire she used a chair to get to the lighter (which was kept on top of the refrigerator), and that she had played with the lighter in the past, she became reluctant to answer questions about what happened after she got the lighter that morning. Mary Ann Savage Dep. at 53–58. The following exchange took place at the deposition:

Q: Did you see fire come out of the end of the lighter than day?

A: Yes.

Q: You did. Okay. And were you using the lighter when that happened, or was somebody else using it?

A: In the house.

Q: In your house?

A: Yes.

Q: Now, were you holding the lighter when you saw -

A: No.

Q: the fire come out of the end of it?

A: No.

*Id.* at 58–59. Later in the deposition, Mary Ann stated that the fire started "outside," *id.* at 63–64, and responded in the affirmative when asked "when your hand started to burn, did you have the lighter in your hand?," *id.* at 78. In response to discovery propounded by defendants, plaintiffs admitted that there are no witnesses who can testify based on personal observation that Mary Ann used the lighter to start the fire; plaintiffs' admissions always noted that "[i]t is by both circumstantial evidence and by way of expert testimony that she was using the Aim 'n Flame lighter." [Def.'s Exs. P–S].

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–1061 (2d Cir.1995) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to

---

**3.** *See* Carol Ann Colon Dep. at 10 ("She told me that she went to the refrigerator and got the lighter, she used a chair to get up there, and in between she went to the living room, played with the lighter, and I think she threw it. When it ignited, I think she threw it to the floor because she got scared. She said she was the first one awake.").

the party opposing the motion." *Id.* (citations omitted). "If reasonable minds could differ as to the import of the evidence ... and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain [ ] summary judgment." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997) (internal citations, alterations and quotations omitted).

## III. Analysis

A. Admissibility of Collins' Expert Opinion as to Cause and Origin

■ "[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under [Fed.R.Evid.] 702— it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002) (*quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). In fulfilling this critical role, the Court considers the indicia of reliability set out in Rule 702,[4] and "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). As set out below, the

Court concludes that Fire Marshal Collins' opinion as to the cause and origin of the fire in the Savage home (which is undisputedly relevant to the jury's task at hand) rests on a sufficiently reliable foundation to be admissible.

Collins has been associated with the Bridgeport Fire Department for over fifteen years, as a fire fighter, fire inspector, senior inspector, deputy fire marshal and fire marshal. Collins Dep. at 15. In his present position as fire marshal, he supervises a deputy fire marshal, a senior inspector who conducts code enforcement and a senior inspector who conducts arson investigations. *Id.* at 16. Between 1990 and 1995, he conducted approximately 500 cause and origin investigations, and has been state certified as a fire inspector, had training at the National Fire Academy, and received a Certificate in Fire Science from the University of New Haven's graduate-level Fire Science Program. *Id.* at 16–21. Additionally, he has taught a class in arson investigation at the State Fire Academy and at a community college. *Id.* at 21.

Collins explained in his deposition the method that he used to form his opinion about the cause and origin of the fire in the Savage home. First, he attempted to rule out other possible causes of the fire, and concluded that the fire was not caused by electrical outlets or any electrical appliance, and that it was very unlikely that a cigarette caused the fire. *Id.* at 138–139.[5]

---

**4.** "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied

the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

**5.** Collins testified that based on his training and experience, a cigarette that was "encapsulated in some kind of material to generate enough heat to cause combustion" could smolder for two to five hours before combusting, but given the fire's starting time (approximately 6:30am) and the absence of any evi-

While it is conceivable that the fire could have been started with matches or a cigarette lighter, Mary Ann's proximity to the utility lighter weighed against such possibilities, *id.* at 140 ("It didn't seem likely she would have used matches and been found in that location with the grill lighter."), and no evidence was found that substantiated the use of matches or a cigarette lighter. Second, Collins considered several facts which while inconclusive standing alone, when taken together made it probable the Mary Ann started the fire with the utility lighter: (1) the fire started in the living room sofa,[6] (2) Mary Ann was found close to the living room sofa,[7] (3) Mary Ann was either found on top of the lighter or within one foot of it[8]; (4) the utility lighter was the only lighting device found in the vicinity of the sofa; and (5) the palm of Mary Ann's right hand was burned.[9] Additionally, Collins consulted a technical chart and determined that the heat from the butane in the utility lighter was hot enough to light to type of synthetic material that was likely to be on the sofa. *Id.* at 204. While he could not reach 100% certainty, based on all of these factors (including the lack of any other explanations), Collins concluded that it was more probable than not that Mary Ann started the fire with the utility lighter. *Id.* at 180–181.

Defendant principally faults Collins not for his training, experience or methodology, but for what defendant perceives as the tentativeness of Collins' conclusions. Defendant is undeniably correct that some of the language used by Collins in his deposition casts his conclusions in a speculative light, especially when Collins is responding to defense counsel's questions incorporating statistical probabilities. There is, for example, a lengthy digression on the likelihood that each of the possible predicates (e.g., whether Mary Ann was holding the lighter) is in fact true, and whether a less than fifty percent likelihood of each predicate being true can support a conclusion of greater than 50% likelihood based on the sum of those predicates being true. *Id.* at 182–184. Additionally, in his Fatal Fire Investigation Report [Pl.'s Ex. C], Collins wrote that a portion of his conclusion was "only speculative, and is not substantiated by the evidence."

While defendant is correct that Collins' choice of phraseology raises red flags on a *Daubert* inquiry, a thorough review of Collins' deposition reveals that much of what defendant characterizes as wild speculation is in fact a poor choice of words on Collins'

---

dence that someone was awake and smoking earlier, "it doesn't seem probabl[e] or even possible" that "a carelessly discarded cigarette" started the fire, although the possibility could not be ruled out completely. *Id.* at 139. He noted that while a carelessly discarded cigarette would have been burned up in the fire, there was no evidence of careless smoking conditions in the first floor apartment. *Id.* at 140.

**6.** *Id.* at 197.

**7.** Based on where Mary Ann was found, "[i]t appeared that she was either in the living room or she was leaving that area of the living room." *Id.* at 173. Collins concluded that the possibility that Mary Ann was in her

bedroom when the fire started was weak, given that she would have had to walk through "a blast of heat into her face" if she had walked from the bedroom to where she was subsequently found after the fire had started. *Id.* at 175; *see also id.* at 176 (explaining why Mary Ann was "obviously not asleep at the time of the fire.")

**8.** *Id.* at 188.

**9.** *See id.* at 131–132 (explaining the burns and noting that "Not a lot of kids, but kids try to put [a fire] out, they are using something that is probably combustible to put the fire out, so that in turn catches on fire and they get burned on their fingers from lighting the fire").

part. Collins readily admits that he is no student of statistics, Collins Dep. at 193, and it is undeniably true that Collins cannot say beyond all possible doubt that his theory is correct. Despite the statistical confusion injected into the deposition testimony, Collins remains unshaken in his ultimate conclusion that it is more likely than not that the fire was started by Mary Ann with the utility lighter, and this conclusion is not "unsupported speculation" but rather is "ground[ed] in the methods and procedures of science":

> The subject of an expert's testimony must be 'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation. * * * Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.

*Daubert,* 509 U.S. at 589–590, 113 S.Ct. 2786 (footnote omitted). Concluding that Collins' opinion is meets the requirements of Rule 702, the Court finds it admissible.[10]

**B. Proof That Mary Ann Used the Lighter to Cause the Fire**

 As shown by the facts set out previously, the circumstantial evidence in this case is adequate for reasonable jurors to conclude that Mary Ann started the fire using the Aim 'n Flame lighter. A jury could find that the fire started in the living room sofa, that Mary Ann was the only person in the living room at the time, and that she was found either on top of or near the Aim n' Flame lighter. Inasmuch as it is undisputed that a fire did in fact occur,

that fires do not occur without cause, and that no other likely cause of the fire has been identified, a jury would not be engaging in the wild speculation suggested by the defendant if it used the circumstantial evidence present here to conclude that defendant's lighter was the cause of the fire.

While defendant reads plaintiffs' responses to discovery (in which plaintiffs admit that there are no witness who can testify based on their direct observation that Mary Ann used the lighter to start the fire) as foreclosing any argument at trial that Mary Ann used the lighter to start the fire, plaintiffs' answers to discovery have always carefully specified that proof of their claim will be by way of circumstantial evidence and expert testimony. It is accurate in a strictly logical sense to say that: (1) if Mary Ann started the fire, *she* would be a witness who could testify based on her direct observations that she started the fire, so (2) because Mary Ann was not listed as such a witness, then (3) plaintiffs cannot claim that Mary Ann started the fire. This reasoning is belied by the fact that plaintiffs' theory in this case has always been that Mary Ann started the fire, and plaintiffs' discovery responses fairly apprise defendant of both this fact and the fact that plaintiffs' proof will be based on circumstantial evidence and expert testimony. Nothing in plaintiffs' discovery responses, therefore, forecloses their arguing at trial, based on circumstantial evidence and expert testimony, that Mary Ann used the lighter to start the fire.

Defendant also argues that statements by Mary Ann at her deposition establish as a matter of law that she did not set the

---

**10.** The *Daubert* portion of Defendant's motion also seeks exclusion of any opinion by Tarald Kvalseth on cause and origin of the fire. Plaintiff's opposition does not rely on Kval-

seth's report (which is focused on human factors engineering and safety) for cause and origin conclusions, so the Court deems this portion of defendant's motion to be moot.

fire. These statements must be seen in context: they are a moderately mentally retarded eleven year old's denial of having started a fire that killed her grandmother and injured her mother and sister, while using a lighter the she was not supposed to be playing with, all almost four years after the fire in question. While a jury may accept the statements as persuasive evidence that Mary Ann did not start the fire, reasonable jurors could also weigh the circumstantial evidence, including the dearth of other plausible explanations for the fire, and find in plaintiffs' favor.

### C. Methods of Proving Defectiveness

■ Defendant asserts that Connecticut follows the ordinary consumer expectation test to determine whether a product is unreasonably dangerous, and that because the Aim n' Flame is no more dangerous than contemplated by the ordinary consumer who purchases it, it is not unreasonably dangerous and thus plaintiffs cannot establish defectiveness. Plaintiffs counter that Connecticut follows the modified consumer expectation test, which allows a jury to weigh a product's risks against its utility, including costs and benefits of childproofing, when considering whether a reasonable consumer would consider the product dangerous. Plaintiffs then point to extensive evidence on which a jury could find in their favor under the modified consumer expectation test.

In *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 694 A.2d 1319 (1997), the Connecticut Supreme Court adopted the modified consumer expectation test, which incorporates a risk-utility analysis. Defendant cites the portion of *Potter* which declares "we continue to adhere to our long-standing rule that a product's defectiveness is to be determined by an ordinary consumer" and its reference to "complex product designs" possibly justifying a modification, *id.* at 219, 694 A.2d 1319, and

argues that in Connecticut, ordinary products are subject to the ordinary test, while complex products may be subject to the modified test. This is a misreading of *Potter*. The court's recognition that "there may be instances involving complex product designs in which the ordinary consumer may not be able to form expectations of safety," *id.* (citations omitted), is a preface to the court's adoption of the modified consumer expectation test. Because the test remains one of consumer expectation, the court reiterated that it continued to adhere to the consumer expectation principle. Dispelling any lingering doubt, the court stated: "We find persuasive the reasoning of those jurisdictions that have modified their formulation of the consumer expectation test by incorporating risk-utility factors into the ordinary consumer expectation analysis." *Id.* at 220, 694 A.2d 1319 (citations omitted).

The *Potter* court held that the modified consumer expectation test is one option for plaintiffs in products liability cases, but plaintiffs are not obligated to use that option, and its propriety depends on the evidence adduced at trial:

> Although today we adopt a modified formulation of the consumer expectation test, we emphasize that we do not require a plaintiff to present evidence relating to the product's risks and utility in every case. As the California Court of Appeals has stated: There are certain kinds of accidents—even where fairly complex machinery is involved—that are so bizarre that the average juror, upon hearing the particulars, might reasonably think: 'Whatever the user may have expected from that contraption, it certainly wasn't that.' Accordingly, the ordinary consumer expectation test is appropriate when the everyday experience of the particular product's users permits the inference that the product did not meet minimum safety expectations.

Conversely, the jury should engage in the risk-utility balancing required by our modified consumer expectation test when the particular facts do not reasonably permit the inference that the product did not meet the safety expectations of the ordinary consumer. Furthermore, instructions based on the ordinary consumer expectation test would not be appropriate when, as a matter of law, there is insufficient evidence to support a jury verdict under that test. In such circumstances, the jury should be instructed solely on the modified consumer expectation test we have articulated today.

In this respect, it is the function of the trial court to determine whether an instruction based on the ordinary consumer expectation test or the modified consumer expectation test, or both, is appropriate in light of the evidence presented. In making this determination, the trial court must ascertain whether, under each test, there is sufficient evidence as a matter of law to warrant the respective instruction.

*Id.* at 222–223, 694 A.2d 1319 (internal citations, quotations and alterations omitted).

Here, plaintiffs have adduced evidence from which a jury instructed on the proper test for defectiveness could conclude that the Aim 'n Flame lighter was unreasonably dangerous. While defendant challenges the "unsworn, unauthenticated" documents and expert reports that form the basis of plaintiffs' evidentiary submission and claims that transcripts of Scripto executives' deposition testimony in other cases is not within any hearsay exception because those witnesses have not been shown to be unavailable at trial, plaintiffs subsequently submitted substitute exhibits, *see* [Doc. # 118], and there is no basis to doubt that plaintiffs will be able to present this evidence in admissible form at trial, either by calling the deponents themselves or establishing their unavailability. *Cf. Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985) (hearsay evidence may be used to defeat summary judgment only upon "a showing that admissible evidence will be available at trial").

### D. Post–Sale Duty to Warn [11]

■ Paragraph 7(1) of the Third Amended Complaint asserts that the defendant is liable "in that it negligently failed to protect the plaintiff by performing a recall and/or it performed an inadequate recall of the product." Defendant asserts that a failure to recall theory is not a separate basis for liability, although defendant acknowledges that there is no Connecticut case law to this effect. Plaintiff correctly notes that the Second Circuit has concluded that the post-sale duty to warn is a valid theory under Connecticut law. *See Densberger v. United Techs. Corp.*, 297 F.3d 66, 71 (2d Cir.2002). Inasmuch as a claim of breach of the post-sale duty to warn is analogous to a claim of failure to recall, plaintiffs' theory has legal viability in Connecticut.

## IV. Conclusion

For the reasons set out above, defendant's motion [Doc. # 110] is DENIED.

IT IS SO ORDERED.

---

**11.** Defendant also challenged plaintiffs' claims of defect in ¶¶ 7(b-c) of the Third Amended Complaint (that the lighter was defective because it allowed butane to flow even when the lighter was in the "off" position and that it could be ignited while in the "off" position). Plaintiffs' opposition withdraws those claims.